16120

LAWTER *ET AL.* v. WAR EMERGENCY CO-OPERATIVE ASSN. *ET AL.*

(49 S. E. (2d) 227)

*Messrs. Carlisle, Brown & Carlisle,* and *C. Yates Brown,* all of Spartanburg, for Appellants,

*Messrs. Osborne, Butler & Moore,* of Spartanburg, for Respondents,

*Messrs. Carlisle, Brown & Carlisle* and *C. Yates Brown,* all of Spartanburg, for Appellants,

August 9, 1948.

OXNER, J.: This case, along with a companion case, has heretofore been before this Court on the pleadings. *Massey et al. v. War Emergency Cooperative Association et al.,* 209 S. C. 292, 39 S. E. (2d) 907.

The action was brought to recover damages for the alleged wrongful death of J. T. Lawter who died almost instantly as a result of injuries received in a collision between a truck driven by him, to which was attached a trailer loaded with 35 bales of cotton, and a truck and tanker, loaded with 4,200 gallons of aviation gasoline, belonging to the War Emergency Cooperative Association. This collision occurred

about 5:00 p. m. on June 23, 1944, at the intersection of U. S. Highway No. 25 and State Highway No. 43. An award under the Workmen's Compensation Act was duly paid to the dependents of Lawter by his employer's insurance carrier, Hardware Mutual Casualty Company, a party plaintiff in this action. The defendant War Emergency Cooperative Association is a motor carrier operating under a certificate issued by the South Carolina Public Service Commission. Its insurer, American Fidelity & Casualty Company, was joined in this suit as a co-defendant.

It is alleged in the complaint that the death of plaintiff's intestate was caused by the negligent operation of the oil tanker. This is denied by the defendants, who also interposed a defense of contributory negligence. At the conclusion of all the testimony, the Court below granted a motion by defendants for a directed verdict upon the ground that the only reasonable inference to be drawn from the evidence was that the plaintiff's intestate was guilty of contributory negligence as a matter of law. The correctness of this ruling is the principal question to be determined on this appeal.

Sate Highway No. 43 is a surface treated road approximately 23 feet wide. It connects the towns of McCormick and Saluda. U. S. Highway No. 25 is one of the principal arteries of travel in going north and south through the Piedmont section of South Carolina. The concrete portion is 18 feet wide. These two highways intersect at almost a right angle at a point about 12 miles north of Edgefield and 15 miles east of McCormick. Here No. 43 runs approximately east and west. Highway No. 25 is referred to in the testimony and briefs as running north and south, although according to the plats it runs in a slightly northwest and southeast direction. Both highways are straight and practically level. Approaching the intersection from the west on No. 43, there is a slight downgrade of 1.3% and approaching from the south on No. 25, there is a slight upgrade of 1%. A two-story building is located about 60 feet west

of Highway 25 and 75 feet south of Highway 43, which at the time of the collision was being used by D. H. Williams as a combination residence, store and filling station. About 50 feet to the rear of this building there is a double garage. The area between the service station and the two highways is paved. The other corners of the intersection are clear and free of obstructions. Highway 43 runs through a short cut which ends, however, at a point about 200 feet west of the intersection.

The driver of the tanker approached this intersection from the south and plaintiff's intestate from the west. On the south side of Highway 43, at a point about 500 feet west of the intersection, there is a sign reading "Stop Sign Ahead". On the same side of the highway, about 350 feet west of the intersection, there is a junction sign, informing one traveling from the west that he is about to approach Highway No. 25. At the northwest corner of the intersection, about 10 or 15 feet from the edge of the pavement of No. 25, there is a stop sign. Plaintiff's intestate had a clear and unobstructed view of all these signs, which were of the standard type used by the State Highway Department, as he approached this intersection from the west. The only sign along Highway 25, in approaching the intersection from the south, is a junction sign on the right of the highway about 300 feet from the intersection. In approaching the intersection, the view across its southwest corner was obstructed to some extent by the buildings mentioned. However, when one traveling in an easterly direction along Highway 43 reached a point 140 feet west of the intersection, he had a view across the paved area in front of the filling station for a distance of approximately 165 feet south along Highway 25; when 50 feet from the intersection, he could see south along Highway 25 for a distance of 750 feet; and when he reached the stop sign, there was nothing to obstruct his view to the south.

Appellants offered no witnesses who saw the collision and relied largely on circumstantial evidence. There was only one other occupant of the cotton truck, O. B. Massey, who was also killed in the collision. Appellants' evidence can better be understood by first discussing that offered by respondents.

The driver of the tanker testified that, traveling alone, he was engaged in transporting gasoline from Savannah to the Greenville Air Base; that he had frequently gone over this route and was familiar with the road and the intersection in question; that he was driving about 30 miles an hour, at which speed the truck and tanker could have been stopped within a distance of approximately 50 feet; that in approaching this intersection, the sun was to his left and somewhat affected his vision; that when 75 or 100 feet south of the intersection, he "raised up in his seat to knock" the sun out of his eyes and looked to the right and to the left, but saw no vehicles approaching on Highway 43 or meeting him on No. 25; that he then "settled down" in his seat and proceeded; that he did not see the cotton truck until "we were just about to hit" whereupon, realizing a collision was inevitable and that there was danger of an explosion, he immediately swerved to the right to "ease the blow"; that the left front of his truck collided with the right side of the cab of the other truck at a point on his right side of the road; that after the collision, his truck went off the pavement, proceeded in a northerly direction, went down a fill and stopped in a field; that he had his foot on the brake pedal but was unable to say whether he applied the brakes because he was dazed from a head injury which he sustained. This witness stated that he did not have sufficient time to estimate the speed of the cotton truck and was also unable to say whether it stopped before entering the intersection.

The only other eyewitness to the collision was a resident of Edgefield County who lived about six miles from this intersection. He testified that between 4:00 and 5 o'clock that

afternoon he drove to the filling station and store operated by Williams and parked near the front; that a few minutes before the collision he came out of the store, followed by Williams, and got in his car, which was facing south; that while talking to Williams, he first noticed the tanker when it was about 50 or 100 yards down the highway and watched it as it approached; that it was traveling on the right side of the pavement at a speed of between 20 and 30 miles an hour, which was not reduced as the intersection was approached; that as the tanker passed him, he first observed the cotton truck through his rear mirror as it "was coming out of the intersection" and saw the vehicles collide, after which the tanker went off the pavement, rolled down a fill and stopped in a field. He said he was unable to estimate the speed of the cotton truck but it appeared to be moving slowly. His testimony is not entirely clear as to the position of the cotton truck when he first saw it. He first testified that he did not see this truck before it reached the "stop" sign. Later he said that he first saw it when it was about five or ten yards west of the edge of the pavement of Highway 25 and that it did not slow down or stop before entering the intersection. This witness further testified that Williams was standing by his car with his back to the intersection and did not see the collision.

The foreman of a highway department crew testified that on the afternoon of this accident they were working near Highway 25 at a point about six or seven hundred feet south of the intersection; that as the tanker passed, it was traveling at a moderate rate of speed on the right side of the pavement; that he paid no further attention to it until he heard the crash of the collision; and that he then took his crew to the scene and removed a number of bales of cotton scattered along the highway.

The only witnesses offered by appellants were a civil engineer who visited the scene about three years after the accident and made a survey and plat of the intersection;

a commercial photographer who enlarged some pictures taken by a passerby immediately after the collision; the coroner who arrived within thirty or forty minutes after the accident and thereafter held an inquest; and a highway patrolman who arrived about the same time and investigated the occurrence. The pictures mentioned, which were offered in evidence, show very clearly the positions of the vehicles after the collision and the parts damaged, the intersection from various angles and generally the scene as it appeared after the accident. The deposition of the highway patrolman was taken by respondents but offered in evidence by appellants. He testified that "there was mud and some glass on the east side of Highway No. 25"; that there were tire marks "on the cotton truck's right hand side of the road and the gas tanker's right hand side of the road", which would place them at the southeast corner of the intersection; and that some of the marks mentioned ran from this point off the highway, down a five foot fill to the place where the tanker stopped about 100 feet north of the intersection, and there were other marks leading from this point to the place where the cotton truck stopped. He also testified that there were skid marks at the northeast corner of the intersection which he figured "were made by the cotton truck as it went to the left when the impact took place." He expressed the opinion from his investigation that the left front bumper of the tractor pulling the tanker "hit the Ford tractor which was pulling the load of cotton in the right hand side of the cab, about the front of the right hand door and the right hand wheel."

The pictures reveal that the cotton truck stopped, facing north, at a point just north of the intersection and a few feet east of the pavement of Highway 25. The tanker stopped, also facing north, at a point considerably farther to the right of No. 25 and about 100 feet north of the intersection. The stop sign located about 10 or 12 feet east of the edge of the pavement on No. 25 was knocked down. The main force of the impact was at the post of the right

front door of the cotton truck. The right front wheel of the cotton truck was lying on the ground and the right side of the cab was generally damaged. There was less damage to the truck of the tanker. The principal damage to the tanker was to the left front bumper and running board. There was also a leak under the front of the tank.

On the day of the accident the weather was clear and the pavement dry.

Under the provisions of Section 1616(21) of the Code of 1942, the driver of the cotton truck was required to stop before entering Highway 25 and to yield the right of way to other vehicles entering the intersection from such through highway, or which were "approaching so closely on such through highway as to constitute an immediate hazard"; but having so yielded, he could then proceed across the intersection. In construing a city ordinance containing similar requirements, it was held in *Lynch v. Pee Dee Express, Inc.*, 204 S. C. 537, 30 S. E. (2d) 449, that the driver on the unfavored highway must not only stop, but was further required to use ordinary care in looking for traffic approaching on the through highway. We said: "It is not sufficient to stop, for to stop and not to look would render the purpose of stopping ineffective. Having stopped the driver must exercise reasonable care and diligence to discover whether traffic on the 'stop street' is approaching the intersection." In 2 Blashfield's Cyclopedia of Automobile Law and Practice, Perm. Ed., pages 223-225, Sec. 1037, we find it stated: "The duty is, indeed, not merely one of looking, but is one of observation, * * * he must look in such an intelligent and careful manner as to enable him to see what a person in the exercise of ordinary care and caution for the safety of himself and others could have seen, under like circumstances."

It is not to be inferred from what has been said that this statute creates an absolute right of way. It is, as stated in *Raaen v. Southern Hotel Supply Co.*,

*Inc.,* D. C. Mun. App., 31 A. (2d) 659, 660, "relative only and must be construed reasonably and applied according to the circumstances of each case." The travelers on both the favored and the unfavored highway must use ordinary care in keeping a proper lookout for vehicles approaching the intersection. If there is a conflict in the testimony as to whether a car on the through highway was approaching so closely "as to constitute an immediate hazard", or if the conclusion to be drawn therefrom is doubtful and uncertain, the Court will not decide the question as one of law and it must be submitted to the triers of the facts.

The testimony in the instant case will now be considered in the light of the foregoing principles. We think there was sufficient evidence of negligence on the part of the driver of the tanker, particularly as to the claim that he failed to keep a proper lookout, to require the submission of that issue to the jury. Only negligence is alleged in the complaint and, therefore, contributory negligence, if established, would defeat recovery. Respondents assert, and the Court below held, that the testimony conclusively shows that plaintiff's intestate failed to stop before entering the intersection. But we do not think that this is the only reasonable inference to be drawn from the testimony.

We now reach the crucial question of whether plaintiff's intestate was guilty of contributory negligence as a matter of law in failing to yield the right of way to the oil tanker. When he reached the intersection, was the tanker approaching so closely "as to constitute an immediate hazard", which should have been observed by him in the exercise of ordinary care in keeping a proper lookout? We think this is the only reasonable inference to be drawn from the evidence. The conclusion is inescapable that if plaintiff's intestate had kept a proper lookout, he would have seen the approaching tanker and would have known in the exercise of ordinary care that it was hazardous to enter the

intersection. The undisputed testimony shows that this tanker was approaching the intersection at a speed not exceeding 30 or 35 miles an hour. When plaintiff's intestate was within 50 or 60 feet of the intersection, he could not have failed to see the approaching tanker if he had used due care in keeping a proper lookout. The physical facts show that the two vehicles reached the intersection almost at the same time and the undisputed testimony of the eyewitnesses is to the same effect. If the plaintiff's intestate failed to look for approaching traffic before entering the intersection, he was guilty of negligence. *Branham v. Wolfe Transportation Co.*, 170 S. C. 164, 169 S. E. 889. If he looked and saw the tanker approaching, he was negligent as a matter of law in not yielding the right of way and in undertaking to cross the intersection.

The argument which appellants' counsel make in seeking to establish negligence on the part of the driver of the tanker in failing to keep a proper lookout applies with equal force to the driver of the cotton truck. As stated in the recent case of *Bishop v. Atlantic Coast Line Railway Co.*, S. C., 48 S. E. (2d) 620, 627, "it would seem illogical to hold that due care by respondents would have prevented the accident and yet ignore the correlative fact that due care by the decedent would also have prevented it."

It is stated in appellants' brief that the behavior of the driver of the tanker in approaching the intersection "was such as to give the impression to decedent that he did not intend to cross Highway 43 but would stop on the shoulder or turn to his right into the dirt road crossing over from 25 to 43 going east." Appellants rely on the following circumstances to support this theory: First, it is said that when plaintiff's intestate saw the driver of the tanker "raise up in his seat to knock the sun out of his eyes", he might have been led to believe that the tanker was going to stop. But after this occurred 75 or 100 feet south of the intersection, the driver sat down and continued his course with undimin-

ished speed until he reached the intersection. It is next suggested that the proof is open to the inference that in approaching the intersection, the tanker was on the right shoulder of the highway, "thereby indicating reasonably to decedent that the tanker was about to stop or turn right." There is not only no support in the record for this suggestion, but all the testimony is to the effect that the tanker was being driven on the right side of the pavement as it entered the intersection. Moreover, the highway patrolman, appellant's own witness, testified that the marks indicated that the vehicles collided on the pavement. Finally, it is contended that the stop sign about 10 or 12 feet east of the pavement at the northeast corner of the intersection was knocked down by the tanker. Assuming that it was, there is no evidence showing that this was done before the impact. The testimony is all to the effect that the driver of the tanker never turned to the right until he saw that a collision was inevitable.

It is true that under the facts presented in *Lynch v. Pee Dee Express, Inc., supra,* it was held that the question of contributory negligence should be submitted to the jury. But in that case there was evidence showing that the driver of the plaintiff's automobile stopped before entering the through street, looked for approaching traffic and seeing none, entered the intersection and had almost completed a left turn around the center of the intersection when his car was struck by defendant's truck. It further appeared that when the driver of the plaintiff's car stopped, her view to the right, the direction in which the truck was approaching, only extended about a block. The testimony there reasonably warranted an inference to the effect that the truck was not in sight at the time the driver of the plaintiff's car stopped and looked for approaching traffic. The facts in the instant case present an entirely different situation.

It appears that after the Court below directed a verdict for respondents, appellants made a motion for a new trial which was refused in a well considered

order. The motion involved substantially the same questions as those raised on the motion for a directed verdict. In settling the case for appeal, the trial Judge held that this order should be incorporated as a part of the record for appeal. He erred in doing so. *Able v. Pilot Life Insurance Co.,* 186 S. C. 26, 194 S. E. 628; *Seay v. Railroad Co.,* 205 S. C. 162, 31 S. E. (2d) 133. The cost of printing such order must be paid for by respondents.

Judgment affirmed.

BAKER, C.J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.